# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ROBERT TODD SETH, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission ("Commission") alleges:

### I. INTRODUCTION

1. From no later than August 2016 through July 2018, Defendant Robert Todd Seth served as an unregistered broker on behalf of 1 Global Capital, LLC ("1 Global" or "the Company"), a South Florida merchant cash advance company. During that time, Seth raised almost $5.2 million for 1 Global from the offer and sale securities in unregistered transactions to at least 75 retail investors primarily located in Texas. Seth earned approximately $282,000 in transaction-based sales commissions from those sales.

2. 1 Global marketed its investment as a safe and secure alternative to the stock market and baselessly claimed that investing in the Company's merchant cash advance business would achieve high single-digit or low double-digit annual returns. Like other 1 Global sales agents, Seth repeated those claims to prospective investors. He also repeated 1 Global's false assertions that its notes were not securities.

3. Unbeknownst to Seth's customers, many of whom invested their retirement savings, 1 Global and its chairman and chief executive officer Carl Ruderman were

misrepresenting how they were using investor money, syphoning off millions in investor funds to fund Ruderman's luxury lifestyle and operate unrelated businesses. 1 Global's business came to a crashing halt when it filed for bankruptcy in July 2018, leaving Seth's customers and thousands of other investors with massive losses.

4. During the time he offered and sold 1 Global's securities, Seth was not registered as a broker-dealer with the Commission or associated with a registered broker-dealer. Additionally, 1 Global did not register its securities offering with the Commission, and there was no applicable exemption from registration for this offering.

5. By engaging in this conduct, Seth violated Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and 77e(c)], and Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78o(a)(1)]. The Commission seeks an injunction against Seth from future violations of these provisions, as well as disgorgement of ill-gotten gains, prejudgment interest on disgorgement, and a civil money penalty.

## II. DEFENDANT

6. Seth, 57, resides in Georgetown, Texas. He is not currently registered with the Commission or the Financial Industry Regulatory Authority ("FINRA"), nor was he during the period he offered and sold 1 Global's notes. However, he was associated with at least three investment advisers registered with the Commission from 2009 until April 30, 2018, and previously held a series 65 securities license.

## III. JURISDICTION

7. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)]; and Sections 21(d), 21(e) and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa(a)].

8. This Court has personal jurisdiction over Seth and venue is proper in the Southern District of Florida because 1 Global transacted business from its headquarters in Hallandale Beach, Florida, and Seth regularly transacted business with 1 Global by email, telephone, and mail from August 2016 through July 2018. These transactions included the offer and sale of unregistered securities while not being registered as or associated with a broker-dealer, the acts that constituted the violations alleged in this Complaint.

9. In connection with the conduct alleged in this Complaint, Seth, directly and indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, and of the mails.

## IV.  FACTUAL ALLEGATIONS

### A.  The 1 Global Offering

10. From 2014 until July 27, 2018, 1 Global and Ruderman fraudulently raised at least $320 million from the sale of unregistered securities to more than 3,600 investors nationwide. 1 Global was in the business of funding merchant cash advances ("MCAs") - short-term loans to small and medium-sized businesses. According to its marketing materials and website, 1 Global provided these businesses with an alternative source of funding to traditional bank loans and other financing methods. 1 Global funded its MCA business and operations almost entirely with money from investors, whom the Company referred to alternately as "Lenders" or "Syndicate Partners."

11. For the vast majority of the four-plus years 1 Global offered and sold its investment, it used instruments entitled either a Syndication Partner Agreement ("SPA") or a Memorandum of Indebtedness ("MOI") as the note or contract between the Company and investors. The SPAs termed the investors partners, while the MOIs called investors lenders. The only use of investor

funds 1 Global specifically identified in both documents as well as in its marketing materials was to make MCAs. After 1 Global received investor funds, it pooled and commingled them together in non-segregated 1 Global bank accounts.

12. The SPAs and MOIs had terms of either nine months or one year. While the MOI stated that it was a nine-month note, for most of the time 1 Global raised money from investors the MOI also stated the note would automatically roll over into a new nine-month term unless the investor expressly informed the Company in writing at least 30 days before the end of the nine months that he or she did not want the note to roll over.

13. 1 Global represented to investors in marketing materials it gave its sales agents - including Seth - to distribute that it collected an average of $1.30 to $1.40 on each dollar it advanced in an MCA. This was the means by which 1 Global and investors both purportedly made a profit.

14. 1 Global did not pay investors the interest or the increase in valuation of their portfolio the Company told them they were earning until the investors cashed out their investments. Although 1 Global sent investors monthly account statements purporting to show each investor's account credited with the interest the investor had earned on MCA repayments, investors did not receive those payments right away. Rather, 1 Global commingled all investor funds into its various bank accounts and sometimes reinvested the investor money into new MCAs. This also allowed 1 Global and Ruderman to misappropriate investor funds.

15. The profitability of the 1 Global investments was derived solely from the efforts of 1 Global and the investments were in a common enterprise. 1 Global commingled all investor funds and used them to fund MCAs, among other things. Investors had no control over how Ruderman and 1 Global used their money. Investors could not and did not manage their MCA

loan portfolios; it was solely up to 1 Global whether and when to use an investor's money to fund MCAs and which MCAs to fund. The success of the investment and whether an investor earned profits was solely dependent on 1 Global's decisions on MCA funding and other uses of money, as well as repayment and collection efforts.

### B.  1 Global and Ruderman's Misrepresentations

16. 1 Global and Ruderman's false representations to investors in marketing materials and on monthly account statements included: (A) that it would use their money to fund MCAs; (B) the monthly statements accurately disclosed the existing value of the investment; and (C) that its supposed independent audit firm agreed with 1 Global's method of calculating investors' returns.

17. In reality, 1 Global and Ruderman used a substantial amount of investors' funds for purposes other than making MCAs, including on operations and non-MCA business transactions. In addition, Ruderman misappropriated at least $32 million in investor funds to enrich himself as well as several companies in which he or his family members had a direct interest. This included money to help fund a family vacation to Greece, monthly payments for a Mercedes Benz, monthly American Express credit card payments, payments for Ruderman's household staff, $4 million to his family trust, and $1 million to one of his sons to invest in cryptocurrency.

18. Furthermore, with Ruderman's knowledge, 1 Global provided every investor with a monthly account statement that falsely showed the investor's portfolio value. The statements reflected the investor's fractional interest in a number of MCAs, and a monetary figure alternatively called "cash not yet deployed," "cash to be deployed," or "cash for future receivables." Regardless of the terminology used, the figure represented the amount of the investment that 1 Global had not yet put into MCAs and was purportedly sitting in 1 Global's bank accounts available for MCA funding.

19. However, starting no later than October 2017, the monthly account statements were false because, due in large part to Ruderman's misappropriation, they overstated by $23 million to $50 million the amount of cash available for investors in 1 Global's bank accounts. Because that amount was false, the total value of each investor's portfolio, the increase in the valuation since they had invested, and the rate of return each account statement showed were all overstated.

20. Finally, each investor's monthly account statement falsely claimed that "Our independent audit firm, Daszkal Bolton L.L.P., has endorsed and agrees with the rate of return formula." However, Daszkal Bolton never audited 1 Global's financial statements, and never endorsed or agreed with 1 Global's rate of return formula.

### C. Seth Acted as an Unregistered Broker-Dealer and Offered and Sold 1 Global Notes in Unregistered Securities Transactions

21. 1 Global recruited a network of several hundred external, mostly unregistered, sales agents, including Seth. 1 Global regularly provided sales materials to these agents, including Seth, for use in marketing the investment. Those materials included a list of Frequently Asked Questions, a history of the Company, and a description of both the MCA program and the investment process. Seth and other sales agents used the materials in soliciting clients to invest, attaching them to emails and using the information when they spoke to prospective investors.

22. The marketing materials touted 1 Global's alleged consistently high returns for investors. The Frequently Asked Questions claimed 1 Global investors had *averaged* "high single digit" and "low double digit" annual returns. In addition, 1 Global sent copies of monthly investor account statements to Seth and other sales agents to show investors. Those account statements showed returns ranging from 8 to 17 percent a year.

23. Using this information, Seth and other sales agents told investors 1 Global could earn them high single digit to low double digit returns a year. Both the Company and sales agents

6

stressed that 1 Global offered better returns than fixed instruments such as annuities, and was a safe, short-term alternative to more risky stock market investments.

24. From no later than August 2016 through July 2018, Seth used the 1 Global-provided materials to offer and sell 1 Global's securities to investors via various means, including in-person meetings.

25. Overall, 1 Global paid Seth approximately $282,000 in transaction-based sales commissions earned as a result of raising approximately $5.2 million from at least 75 investors. During the time he sold 1 Global notes in unregistered securities offerings, Seth was neither a registered broker-dealer nor associated with a registered broker-dealer.

## CLAIMS FOR RELIEF

## COUNT I

### Violations of Sections 5(a) and 5(c) of the Securities Act

26. The Commission repeats and realleges Paragraphs 1 through 25 of this Complaint as if fully set forth herein.

27. No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities Seth offered and sold as described in this Complaint and no exemption from registration existed with respect to these securities.

28. From no later than August 2016 and continuing through July 2018, Seth directly and indirectly:

>   (a)   made use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, through the use or medium of a prospectus or otherwise;
>
>   (b)   carried or caused to be carried securities through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; or

  (c) made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security;

without a registration statement having been filed or being in effect with the Commission as to such securities.

  29. By reason of the foregoing, Seth violated, and unless enjoined is reasonably likely to continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## COUNT II

## Violations of Section 15(a)(1) of the Exchange Act

  30. The Commission repeats and realleges Paragraphs 1 through 25 of this Complaint as if fully set forth herein.

  31. From no later than August 2016 and continuing through July 2018, Seth, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce effected transactions in, or induced or attempted to induce the purchase or sale of securities, while he was not registered with the Commission as a broker or dealer or not associated with an entity registered with the Commission as a broker-dealer.

  32. By reason of the foregoing, Seth violated, and unless enjoined is reasonably likely to continue to violate, Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests the Court find Seth committed the violations alleged, and:

### A.

### Permanent Injunctive Relief

Issue a permanent injunction enjoining Seth from violating Sections 5(a) and 5(c) of the

Securities Act and Section 15(a)(1) of the Exchange Act.

**B.**

**Disgorgement and Prejudgment Interest**

Issue an Order directing Seth to disgorge all ill-gotten gains or proceeds received as a result of the acts and/or courses of conduct complained of herein, with prejudgment interest thereon.

**C.**

**Civil Money Penalties**

Issue an Order directing Seth to pay a civil money penalty pursuant to Section 20(d) of the Securities Act and Section 21(d) of the Exchange Act.

**D.**

**Further Relief**

Grant such other and further relief as may be necessary and appropriate.

**E.**

**Retention of Jurisdiction**

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

December 14, 2020                                         Respectfully submitted,

                                                          Robert K. Levenson, Esq.
                                                          Senior Trial Counsel
                                                          Florida Bar No. 0089771
                                                          Direct Dial:  (305) 982-6341
                                                          Email:  levensonr@sec.gov

Attorney for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1950
Miami, Florida 33131
Telephone: (305) 982-6300